IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COUPA SOFTWARE INC. and LLAMASOFT LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| OPTILOGIC, INC., DONALD HICKS, and DOES 1-10, | ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiffs Coupa Software Inc. ("Coupa") and LLamasoft LLC ("LLamasoft") allege as follows against Defendants Optilogic, Inc. ("Optilogic"), Optilogic's CEO, Donald Hicks ("Hicks"), and unknown individuals and/or entities designated as DOES 1 through 10.

## NATURE OF ACTION

1.      Coupa is a software company that offers a suite of products that allow companies to have greater visibility into and control over how companies spend money, optimize supply chains, and manage liquidity.  The tools Coupa offers created a new and rapidly growing category of software: Business Spend Management.  From its headquarters in Foster City, California, Coupa's software tools help businesses around the world achieve real, measurable value and savings that drive increased profitability.

2.      One of Coupa's market-leading software products is a supply chain design and planning ("SCDP") platform that is the result of decades of research and development and the investment of over $1 billion.  Earlier versions of this software were developed by Plaintiff LLamasoft, which Coupa acquired in November 2020 for $1.5 billion (the "Acquisition"). LLamasoft is now a wholly owned subsidiary of Coupa.

3.      Since the Acquisition, Coupa has continued to develop and improve its supply chain software.  This software offers an industry-leading platform that leverages numerous algorithms, vast data models, and advanced artificial intelligence.  Each day, Coupa's customers rely on its supply chain solution to model, forecast, and optimize all aspects of their supply chains, gaining insights from Coupa's comprehensive solution and the source code, algorithms, and database schemas that power it.

4.      Defendant Hicks was the founder of LLamasoft, and its CEO through around April 2018.  In mid-2017, Hicks entered into a Restrictive Covenant Agreement in connection with a LLamasoft merger transaction.  This agreement imposed confidentiality obligations and a five-year noncompetition and non-solicitation obligation on Hicks.

5.      In April 2018, Hicks resigned as CEO of LLamasoft, and in July 2018, he signed a general release favoring LLamasoft.  As part of this agreement, Hicks represented and warranted that, following his separation from the company, he would retain company confidential information only for his use as an investor or board member, and that he would return all company confidential information if he ceased to be an investor.

6.      Simultaneously with his resignation as CEO, Hicks became the Chairman of LLamasoft's Board of Directors.  In connection with this role, Hicks entered a letter agreement with LLamasoft in which he reaffirmed his obligation to "maintain the confidentiality of the Company's proprietary and confidential information," and he agreed that he had fiduciary duties to the company.  As a Director, Hicks also owed fiduciary duties to the company under Delaware law.

7.      Notwithstanding his confidentiality and noncompetition obligations and his fiduciary duties, Hicks formed Optilogic in 2018, apparently while he was still the Board Chair of LLamasoft and less than two years into his five-year noncompetition agreement.

8.      Then, starting in 2020 and still well within the noncompetition and non-solicitation period, Hicks and Optilogic began to systematically hire Hicks's former colleagues from LLamasoft, including many who had joined Coupa after the Acquisition.  In particular, Optilogic's Vice President of Product Management, Senior Director of Product Management, Vice President of Business Development, Vice President of Supply Chain Engineering, Principal Research Scientist, Applied Research Manager, Senior Software Engineer, and Software Engineer, among others, each worked at LLamasoft for years in roles that involved developing the company's supply chain optimization software and its customer base prior to the Acquisition.

9.      Unsurprisingly given this roster of executives, today, Optilogic offers software that mimics Coupa's supply chain design and management software in many ways, including down to the structure of its menus, features, fields, and outputs.  Given the timing of when Optilogic was launched, the speed with which it began offering supply chain optimization software, and the degree to which its offering mirrors Coupa's, it is not plausible to believe that the Optilogic team developed their software from scratch.  Instead, they and Optilogic relied on their intimate knowledge of Coupa's (and LLamasoft's) proprietary software, copying it in many key respects.

10.     This action seeks redress for Defendants' copyright infringement, breach of contractual obligations and fiduciary duty, misappropriation of trade secrets, and intentional interference with the contractual relations of others.  Plaintiffs seek compensatory damages, punitive damages, injunctive relief, and attorneys' fees against Defendants.

## THE PARTIES

11.     Coupa is a corporation registered in the state of Delaware with its principal place of business at 950 Tower Lane, 20th Floor, Foster City, California 94404.  Coupa is a leading "Software as a Service," or "SaaS," company with a focus on business spend management, and it is a global leader in supply chain design and planning software.  Coupa's supply chain design and planning products, which include Supply Chain Modeler (formerly known as Supply Chain Guru X), Supply Chain App Studio, Demand Modeler, Supply Chain Prescriptions, and Data Guru, allow businesses to use Coupa's comprehensive data models, sophisticated algorithms, and powerful artificial intelligence (AI) to meet continuous supply chain modeling needs.

12.     LLamasoft is a limited liability company registered in the state of Delaware with its principal place of business at 950 Tower Lane, 20th Floor, Foster City, California 94404. Following the Acquisition in 2020, LLamasoft has been a wholly owned subsidiary of Coupa.

13.     Hicks is a Michigan resident and is the founder and CEO of Optilogic.  He was the founder of LLamasoft and served as that company's CEO until 2018.

14.     Optilogic is a company incorporated in the state of Delaware with its principal place of business at 309 S. Main Street, Ann Arbor, Michigan.  Using Coupa's trade secrets, confidential information, and copyrighted source code, Optilogic offers supply chain software that is copied from and based on Coupa's supply chain design and planning products.

15.     The true names and capacities, whether individual, corporate, or otherwise, of defendants designated as DOES 1 through 10, are unknown to Plaintiffs, who therefore sue said DOE defendants by such fictitious names.  Upon ascertaining their true and correct names, titles, capacities, and/or identities, Plaintiffs will amend this Complaint accordingly.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Coupa asserts claims under the Defend Trade Secrets Act (15 U.S.C. §§ 1836 *et seq.*) and the Copyright Act of 1976 (17 U.S.C. § 101 *et seq.*).

18.     This Court has supplemental jurisdiction over Coupa's state law claims pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Optilogic because it is a Delaware corporation.

20.     This Court has personal jurisdiction over Hicks because he consented to this Court's exclusive jurisdiction in the 2017 Restrictive Covenant Agreement.

21.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(a).

## FACTUAL BACKGROUND

**I.     Coupa and LLamasoft Spent Decades and Over a Billion Dollars Developing Complex and Sophisticated Supply Chain Design and Planning Products.**

22.     Coupa's supply chain design and planning solution is the result of decades of research and development by dozens of software engineers.  In 2020, Coupa strengthened its supply chain capabilities by acquiring LLamasoft, a leader in AI-powered supply chain design and planning, for approximately $1.5 billion.  By then, LLamasoft had invested nearly 20 years of effort into developing its product.

23.     In the years after the Acquisition, Coupa added new functionalities to the former LLamasoft products and developed further enhancements and innovations, including developing a cloud-based option, adding speed as a constraint, and increasing the speed and scale of "solvers."

The aspects of the software that Optilogic has copied as described in this Complaint, however, were all present in the software in some form prior to the Acquisition.

24.    This heavy investment by Coupa (and previously by LLamasoft) has produced an industry leading platform that leverages numerous algorithms, vast data models, and advanced artificial intelligence.  Each day, Coupa's customers rely on its supply chain solution to model, forecast, and optimize all aspects of their supply chains, gaining insights from Coupa's comprehensive solution and the source code, algorithms, and database schemas that power it.

25.    Coupa's supply chain offering stands out from the competition because of its comprehensive nature.  While some competitors offer some features that are similar to a subsect of the features that Coupa's supply chain software platform provides, no company has spent the time and resources required to successfully integrate the panoply of features offered by Coupa.  These products include the Supply Chain Modeler, Supply Chain App Studio, Demand Modeler, Supply Chain Prescriptions, and Data Modeler.

26.    The core of Coupa's supply chain software platform is Supply Chain Modeler (formerly known as Supply Chain Guru X).  This is an "all-in one" modeling solution that transforms supply chain design and analysis from conventional one-off projects to a consistent and repeatable process.  Customers can use Supply Chain Modeler to quickly access data, model their supply chain, and run countless design scenarios.  Supply Chain Modeler's digital models are fueled by powerful algorithmic engines.  These include algorithms for network optimization, inventory optimization, transportation optimization, simulation, "Greenfield analysis," and enterprise simulation.  These numerous algorithms and the relatedly high number of functionalities set Supply Chain Modeler apart from other supply chain programs on the market.

27.     Supply Chain App Studio deploys purpose-built applications to decisionmakers across a customer's enterprise by leveraging information gathered from across a customer's systems, data lake, and external data sources.  The purpose-built applications provide business users with the ability to see input data, ask questions, interact with visualizations, and share information among stakeholders across the enterprise.  Further, applications can be configured to distribute results to other systems or processes, efficiently pushing data-driven decisions into prompt action.

28.     Demand Modeler relies on advanced machine earning capabilities to reveal patterns, quantify the impact of external factors, and rapidly model scenarios predicting demand in the mid- to long-term.  Demand Modeler's artificial intelligence-fueled demand modeling allows customers to recognize complex trends and identify the impact of causal factors on supply chain and financial organizations.  Customers can use Demand Modeler to achieve clarity on demand signals based on a combination of historical demand models and machine-learning algorithms and to digitally test what-if demand scenarios.

29.     Supply Chain Prescriptions enhances scenario planning data by providing recommended data-driven insights into the highest cost drivers in an enterprise's supply chain and ways to reduce these costs, giving users the right set of scenarios to run.

30.     Several versions of Coupa's supply chain software are copyrighted, as demonstrated by Copyright Registrations TX 9-354-381, TX 9-354-387, and TX 9-354-392, attached to this Complaint as **Exhibits A, B, and C**.

31.     In obtaining these copyright registrations, Coupa did not disclose and kept secret certain aspects of the source code for its supply chain software.  In particular, Coupa maintains as trade secrets the algorithms that power four of the key functions of Coupa's supply chain software:

(1) network optimization, (2) inventory optimization, (3) transportation optimization, and (4) simulation. These algorithms are contained in Coupa's source code and are proprietary to Coupa. These algorithms were developed over many years at great effort and expense.

32. The proprietary algorithms behind the key functions of Coupa's software are kept secret and are not generally known in the industry. Coupa regularly monitors competitors and is not aware of any competitor that is legally offering supply chain software with the functionality afforded by these algorithms. Coupa's supply chain software is superior to its competitors' software in part because of these proprietary algorithms, so Coupa benefits from maintaining each of the algorithms as a trade secret.

33. Coupa restricts access to its supply chain source code to only employees with a need to access the source code in order to design, develop, improve, or support the product. Coupa requires employees to sign non-disclosure agreements as part of their employment. Coupa also requires customers with access to all versions of the software to enter comprehensive license agreements containing non-disclosure provisions before using the SaaS platform or receiving the software that is installed on the customer's premises. The software that is installed on-premises is delivered in object code form only and cannot be read by humans. In order to derive the source code, the user would need to "reverse engineer" the object code, which is prohibited under the terms of Coupa's end-user license agreement with its customers.

## II. Hicks, a Co-Founder and Former CEO of LLamasoft, Agreed Not to Misuse LLamasoft's and Coupa's Proprietary Information, and Not to Compete Against LLamasoft from 2017 to 2022.

34. Hicks founded LLamasoft around 1998 and served as its CEO until 2018.

35. In connection with his employment at LLamasoft, in 2012, Hicks signed a Confidentiality and Intellectual Property Agreement, in which he agreed that all LLamasoft

"Proprietary Information," including "computer programs, source documentation, trade secrets" and "processes," among other things, was "the sole property of" LLamasoft. Hicks further agreed not to disclose any of LLamasoft's proprietary information (including know-how, trade secrets, processes, computer programs, etc.) to "anyone outside [the] Company," and he agreed to "use and disclose" LLamasoft's proprietary information within the company "only as may be necessary in the ordinary course of performing my duties as an employee of the Company."

36.    On June 1, 2017, Hicks entered a Restrictive Covenant Agreement in connection with a LLamasoft merger. A copy of this agreement is attached as **Exhibit D**.

37.    In Section 1.2 of the Restrictive Covenant Agreement, Hicks agreed that, for a period of five years, he would not:

> directly or indirectly, whether as a stockholder, owner, member, partner, director, officer, employee, agent, consultant or contractor, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged (i) in competition with the Company during such Stockholder's Restricted Period, or (ii) in the business of the design, development, marketing, sale and/or provision of commercial supply chain design, supply chain planning, or supply chain execution software and services, in any geographical or market area where Company has conducted business or provides products or services during such Stockholder's employment or engagement as a consultant with the Company[.]

38.    In Section 1.3(b) of the Restrictive Covenant Agreement, Hicks further agreed that, for a period of five years, he would not "directly or indirectly . . . solicit, aid or induce any advisor, consultant, employee, contract worker, representative or agent of the Company or any of its Affiliates to leave such employment or other position," and further that he would not "hire or retain any such employee Person."

39.     Hicks also reaffirmed his confidentiality obligations and agreed not to "disclose any Confidential Information to any other Person," except in narrow and inapplicable circumstances. Ex. D § 1.1(a).

40.     On July 11, 2018, Hicks resigned as CEO and signed a general release the following day. A copy of that agreement is attached as **Exhibit E.**

41.     In his 2018 release, Hicks again reaffirmed his confidentiality obligations. In Section 14, he represented and warranted that, following his separation from the company, he would retain company confidential information "for the sole purpose of using same in my capacity as an investor in, and member of the Board of Directors of, the Company. If, at some point following the Separation Date, I cease to be an investor in the Company, I shall promptly return to the Company all confidential information then in my possession or control, including (without limitation) all documents of any kind and in whatever medium evidenced."

42.     On the same day as his resignation, Hicks became the Chairman of LLamasoft's Board of Directors. In connection with this role, Hicks entered a letter agreement with LLamasoft. A copy of this letter agreement (with compensation information redacted) is attached as **Exhibit F**.

43.     In Section IV of this letter agreement, Hicks again reaffirmed his obligation to "maintain the confidentiality of the Company's proprietary and confidential information," and he agreed that he had the fiduciary duties of loyalty and care to the company.

## III.    Hicks Founds Optilogic in 2018 and Launches a Copy of Coupa's Supply Chain Optimization Software in 2022.

44.     On its website, Optilogic claims that it "was founded in 2018 with a singular vision: to redefine the principles of supply chain design by enabling all people of any organization to realize the benefits of greater enterprise design through our software." *See* https://optilogic.com/about/.

45.     Between 2018 and 2021, Hicks and Optilogic quietly hired numerous former LLamasoft employees who had been involved in designing, developing, improving, or supporting LLamasoft's supply chain software.  Hicks hired several of these employees away from Coupa after the November 2020 Acquisition.

46.     Despite these activities, Plaintiffs were not aware that Optilogic was planning to offer supply chain design and management software in competition with Coupa until around November 2022, when Optilogic publicly launched its software platform, which it calls "Cosmic Frog."  Cosmic Frog copies nearly all the features of Coupa's Supply Chain Modeler platform. Coupa is not aware of Hicks ever affirmatively disclosing to LLamasoft, its board of directors, or to Coupa that he had founded a company or that the company was founded with the intention of competing against LLamasoft and Coupa's supply chain design and management software.

47.     To understand the overwhelming similarities between Cosmic Frog and Coupa's software, it is necessary to explain how customers interact with supply chain design and planning software. When a customer begins using supply chain software, the first task is for the customer to input data relating to their supply chain network.  This information sets the parameters for the network, such as pricing information, customer identities and locations, supplier identities and locations, warehouse and labor identities and locations, types of finished goods and raw materials, customer demand, and transportation routes and options.  With this and other data, the software then generates an output file (called a "linear program" or "LP" file) reflecting the software's recommendations for an optimized supply chain network.

48.     The structure of the output LP file reveals information about how the software is structured and how it functions.

49.     If a user were to input the same data regarding a supply chain network into the Coupa platform and into the Optilogic Cosmic Frog software, the output LP files would contain numerous similarities that suggest that Optilogic copied Coupa's software.

50.     For example, output LP files from both Optilogic's Cosmic Frog and Coupa's SCDP software calculate a series of flows.  A flow would describe, for example, the transmission of a specific good or material from a source to a destination using a specific route.  The sum (or difference) of those flows is used to calculate overall costs or revenues associated with the supply chain.  In calculating each flow, Cosmic Frog includes the same components (such as customer location, good identity, manufacturer location, and a product code) and its output file lists these components in the exact same order as Coupa's output file and using the same nomenclature.

51.     The results of Cosmic Frog's calculations in its output LP files are also nearly identical to the results in Coupa's output files.  In particular, when presented with the same supply chain model (i.e. the same input data), Cosmic Frog's calculations regarding flow path are identical to Coupa's calculations down to fifteen digits.

52.     Publicly available videos and information on Optilogic's website also provide evidence that its supply chain optimization software is largely copied from Coupa's software.  For example, Optilogic's Cosmic Frog is an integrated offering that allows users to solve four different aspects of the supply chain on a single database: (1) inventory optimization, (2) transportation optimization, (3) network optimization, and (4) simulation.

53.     Optilogic's website contains pages regarding "Inventory Strategy," "Transportation Route Optimization," "Supply Chain Network Optimization," and "Simulation."

54.    A promotional video on Optilogic's Youtube channel claims that Cosmic Frog "combines optimization, simulation, and risk engines into one, cloud-based, intuitive solution." *See* https://www.youtube.com/watch?v=cr2Rx3VXgU8.

55.    Coupa, and LLamasoft before it, have had many competitors in the supply chain optimization field over the years. A core reason Coupa won customers versus the competition is because it was the only company—until Optilogic—to offer all four of these features on a platform linking to a single database.

56.    There are many other examples of how Optilogic's offering mirrors Coupa's. For example, Optilogic's supply chain modeling paradigm is virtually identical to Coupa's. The modeling paradigm refers to how Coupa sets up its supply chain optimization database—how supply chain concepts are divided and grouped, and how parameters and policies are defined. For example, a typical approach to setting up a supply chain model involves loading different products, sites, customers, demands and requirements for customers and products, time periods, and policies that describe the behavior of a supply chain network. There are myriad ways a software developer could separate these tasks or group them. Optilogic's approach is identical to Coupa's.

57.    Similarly, Optilogic offers the same flexibility in applying policies to the network that Coupa offers, an important differentiator between Coupa and other competitors. A policy allows a user to define what options are available within the supply chain network—for example, a customer may set as a policy that the model should always pick the lowest cost good available, even if it is not a customer's most preferred choice. Before Optilogic, Coupa's was the only product that allowed for highly flexible policies that could be applied across the entire network, or to a group of sites, or a group of products, or other sub-parts of the supply chain model.

58.     Other competitors struggled to provide this flexibility, giving Coupa's offering a competitive edge.  Optilogic's Cosmic Frog allows for flexible policies in the same way Coupa does.

59.     Similarly, the schema for Optilogic's product is apparently identical to Coupa's. The schema refers to how data is categorized, sorted, and stored within the database.  In the past, after acquiring smaller competitors in the supply chain optimization field, LLamasoft would inevitably find that converting their customer models to LLamasoft's model was difficult and tedious.  For example, one competitor had a single data table in their model entitled "suppliers, plants, customers, and warehouses."  Converting the data stored in that field to LLamasoft's model was challenging and required writing specific code to achieve because in LLamasoft's model, the data representing those items are not grouped in the same way.

60.     Optilogic's schema, however, appears identical.  This allows Optilogic to transition Coupa's customers to its platform with remarkable ease, with nearly a 1:1 conversion between the data stored in the Coupa model to how it must be presented to work in the Optilogic model.

61.     Optilogic even issued a press release touting how easy it is to convert Coupa models to Optilogic models.  *See* https://www.prnewswire.com/news-releases/optilogic-introduces-converter-for-coupa-supply-chain-modeler-301701346.html.

62.     Optilogic's user interface works in nearly identical fashion to Coupa's.  The way drop down menus are set up and where commands are found are nearly a mirror image of each other.

63.     Aside from these big picture similarities, Optilogic has also copied numerous smaller features of Coupa's software that differentiate it from competitors' solutions.

64.     As a first example, Optilogic has copied Coupa's unique concept of using cost band definitions.  This allows users to create tables defining the step size and maximize size for cost bands, among other considerations, to be factored into a supply chain optimization model.

65.     As a second example, Optilogic has also copied Coupa's unique concept of "cost pipes," which allows the model to be linked to external cost data and allowing for live refresh of this data within the model.

66.     As a third example, the way that Optilogic offers Scenario and Scenario Item Design are highly similar.  In Coupa's platform, running scenarios allows users to test different potential configurations of their supply chain network to evaluate different hypothetical scenarios. This feature was unique and offered Coupa a substantial competitive advantage because Coupa found a more efficient way to permit all user scenarios to sit in a single database.  Coupa's approach, compared with its competitors, saved computing space, and made it easier for users to change their scenarios.  Optilogic offers the same functionality with the same efficiencies.

67.     As a fourth example, Optilogic has copied the way that Coupa allows users to input different units of measure and currency into their models, with the software providing an automatic conversion into a common unit of measure.

68.     As a fifth example, Optilogic has copied Coupa's unique concept of allowing users to apply shipment rules in transportation costing.  This allows a user to calculate more precise shipping costs by applying unique rules when, for example, a shipment is not full.  Previous models simply applied a pro rata cost in such a scenario, but Coupa's innovation was to allow users to input bespoke rules to apply in situations like this.

69.     As a sixth example, Optilogic copies Coupa's innovation of dividing Transportation and Sourcing into two separate policies rather than combining them.  In a supply

chain model, the sourcing policy will be a line in the database for each source for a particular product. This data defines the structure of the network by identifying all potential sources of goods. For the model to work, users must also identify each demand, and link each demand with a source for the good demanded. And the user must define the movement from each source to each site. The goods could move, for example, by truck, ship, air, etc. In competitors' products, the model had only a single policy that combined source and shipment mode. Coupa was the only company to split these into two policies, allowing greater flexibility and precision in the model. Optilogic does this as well.

70.    As a seventh example, Optilogic's copying of Coupa's supply chain software is so pervasive that it has even copied idiosyncratic naming conventions for aspects of the supply chain model, such as "work center / work resources" and "machines and labor."

71.    Optilogic's copying has severely harmed Plaintiffs. Optilogic executives had access to Plaintiffs' pricing and customer lists, and they had detailed knowledge of these customers' needs and preferences from having worked with these customers at LLamasoft. Optilogic has targeted Coupa's SCDP customers and prospective customers, and as a result, Plaintiffs have lost customers worth millions of dollars per year directly to Optilogic over the past several years.

72.    The many similarities between Optilogic's Cosmic Frog and Coupa's software strongly suggest that Optilogic is using the same proprietary and secret algorithms to power its software that Plaintiffs developed.

73.    In short, Hicks formed Optilogic and hired a team of software engineers that know Coupa's supply chain software in intimate detail because they helped develop it at LLamasoft, and

they have replicated Plaintiffs' software from the schema, to the user interface, to the idiosyncratic naming conventions.

74.     Plaintiffs developed the trade secret and copyrighted code in Coupa's supply chain software platform at the cost of over $1 billion and decades of effort.  Defendants have copied and misappropriated that technology in the space of just a few years.

## IV.   Many of Optilogic's Senior Executives Developed LLamasoft's Software and Owed Confidentiality Obligations to LLamasoft and Coupa.

75.     In just a few years of operation, Hicks and Optilogic have hired multiple senior executives that had a role in developing LLamasoft's supply chain optimization platform and business.  These include:

(a)     Rebecca Janowiak, Optilogic's Vice President of Product and Solution Design. Janowiak spent nine years at LLamasoft, including as a Senior Product Manager for Supply Chain Guru X (now known as Data Modeler).From November 2020 to June 2021, she was Coupa's Director of Business Value Engineering.  She joined Optilogic in September 2021.

(b)     Jim Wilson, Optilogic's Senior Director of Product Management.  Wilson spent five years at LLamasoft, including as VP of Solution Architecture and Director of Supply Chain Design Products.  From November 2020 to May 2021, Wilson was Coupa's Regional VP of Solution Delivery.  He joined Optilogic in May 2021

(c)     John Ames, Optilogic's Vice President of Business Development.  Ames worked for LLamasoft from about 2010 to about 2018, including as its Senior VP of Solutions and its President.  He joined Optilogic in August 2020.

(d)     Steve Sommer, Optilogic's Vice President of Supply Chain Engineering.  Sommer worked at LLamasoft for about ten years, including as a Senior Solutions Engineer. He joined Coupa following the Acquisition and served as its Senior Director of Applied Research until February 2022.  He joined Optilogic shortly after leaving Coupa.

(e)     Ali Taghavi, Optilogic's Principal Research Scientist.  Taghavi specnt about eight years working in various research scientist roles at LLamasoft, then several months as a Senior Manager for Coupa after the Acquisition.  He joined Optilogic in March 2021, the same month he left Coupa.

(f)     Jeremy Castaing, Optilogic's Applied Research Manager.  Castaing worked for LLamasoft from about 2016 to 2020 in various engineering and research roles, then joined Coupa after the Acquisition as an Engineering Manager.  He joined Optilogic in June 2022, the same month he left Coupa.

(g)    Mike Surel, Optilogic's Senior Software Engineer. Surel worked for LLamasoft from about 2017 to 2020 in software engineering and development roles, then worked for Coupa as a Senior Software Engineer until June 2021. He joined Optilogic in July 2021.

(h)    Reza Yovan, Optilogic's Software Engineer. Yovan worked for LLamasoft as a Software Engineer from 2018 to 2020, then at Coupa as a Software Engineer until October 2021. He joined Optilogic in November 2021.

76.    In their LLamasoft employment agreements, each of the employees named above agreed to maintain the confidentiality of LLamasoft's information, including its product and business information. For those that worked at Coupa after the Acquisition, they also agreed to maintain the confidentiality of Coupa's information, including product and business information.

77.    Hicks and Optilogic (via Hicks) were aware of these employees' confidentiality obligations, including because Hicks was the CEO of LLamasoft when they worked there, and because confidentiality restrictions are a routine aspect of employment agreements in the SaaS industry.

78.    Hicks and Optilogic were also aware or, through the exercise of reasonable diligence, should have been aware of these employees' confidentiality obligations to Coupa.

79.    Hicks and Optilogic have induced these former employees to violate their confidentiality obligations by assisting in the creation and/or sale of software that is essentially a copy of LLamasoft's (now Coupa's) software.

80.    Some of the individuals identified above, including Janowiak and Wilson, also had detailed knowledge of Coupa's supply chain software product roadmap because they helped develop it at LLamasoft/Coupa. Since they left Coupa for Optilogic, they have built the same type of features at Optilogic. For example, Optilogic offers a transportation route optimizer feature, which was conceptualized at Coupa.

**COUNT ONE**
**(Copyright Infringement)**
**(Against Optilogic, Hicks, and DOES 1–10)**

81.     Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 80 of this Complaint.

82.     Coupa's supply chain design and planning products' software are original works of authorship and constitute copyrightable subject matter under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*  Coupa owns Copyright Registrations for several versions of its supply chain design and planning programs (the "Copyrighted Software").  The U.S. Registration Numbers relevant to this lawsuit are TX 9-354-381, TX 9-354-387, and TX 9-354-392, attached as **Exhibits A, B, and C**.  Coupa is the sole and exclusive owner of all rights, title, and interest in and to its supply chain design and planning software, which includes the copyrighted materials.

83.     As the owner of the Copyrighted Software, Coupa enjoys the exclusive right to, among other things, reproduce the Copyrighted Software, prepare derivative works and distribute copies of the Copyrighted Software.  17 U.S.C. §§ 101, 106.

84.     Defendants are directly liable for direct copyright infringement for at least the following reasons.  Defendants had access to the Copyrighted Software and copied all or a subset of it in connection with developing and deploying Optilogic's supply chain products, and providing those products to third parties and end-users.  Defendants have, without authorization, created, reproduced, and distributed derivative works, including Coupa's products described above, based upon the Copyrighted Software.

85.     Defendants have directly infringed, and will continue to infringe, Coupa's copyrights in the Copyrighted Software at least by creating, reproducing, and distributing Optilogic's products.

86.     Defendants' infringement was deliberate, willful, and in disregard of Coupa's rights, and was committed for the purpose of commercial gain.

87.     Defendants' infringement of Coupa's copyrights has irreparably harmed and will continue to irreparably harm Coupa unless restrained by this Court. Coupa's remedy at law is not adequate, by itself, to compensate for the harm inflicted and threatened by Defendants. Thus, in addition to all other remedies to which it is entitled, Coupa is entitled to injunctive relief restraining Defendants, its officers, agents, servants, employees, successors, assigns and all persons acting in concert with any of them, from engaging in further acts of copyright infringement.

88.     As a direct and proximate cause of Defendants' copyright infringement, Coupa has suffered, and will continue to suffer, monetary loss to its business reputation and goodwill. Coupa is also entitled to recover from Defendants all damages it has suffered and will continue to suffer as a result of Defendants' infringement in actual amounts to be proven at trial as well as any and all gains, profits, and advantages Defendants have obtained as a result of their infringement.

## COUNT TWO
### (Breach of 2017 Restrictive Covenant Agreement)
### (Against Hicks)

89.     Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 88 of this Complaint.

90.     Hicks entered the June 1, 2017 Restrictive Covenant Agreement attached as **Exhibit D**.

91.     LLamasoft (acquired by Coupa in 2020) fully performed its obligations under the 2017 Restrictive Covenant Agreement.

92.     Hicks breached the 2017 Restrictive Covenant Agreement in numerous ways, including at least by: using Coupa's proprietary and confidential information to develop and direct

his development of Optilogic's products; using Coupa's confidential information as his own and claiming it was Optilogic's; disclosing Coupa's proprietary information to others; competing against Coupa before the duration of his noncompetition obligations expired, and recruiting, soliciting, and hiring numerous LLamasoft and Coupa employees to leave their employment and join him at Optilogic.

93.     Hicks's violations of his contractual obligations have been continuous and ongoing since his founding of Optilogic.

94.     Plaintiffs did not become aware that Hicks had created a company offering a competing software platform based on Plaintiffs' intellectual property, or that he had hired a large team of former LLamasoft and Coupa employees to offer this competing software platform, until around November 2022. Plaintiffs could not have learned of Hicks's actions before that time through the exercise of reasonable diligence.

95.     As a direct and proximate result of Hicks's breaches, Plaintiffs have suffered damages, and Hicks has been unjustly enriched, in an amount to be determined at trial.

## COUNT THREE
### (Breach of 2018 General Release Agreement)
### (Against Hicks)

96.     Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 95 of this Complaint.

97.     On July 12, 2018, Hicks agreed to a General Release Agreement attached as **Exhibit E**.

98.     LLamasoft (acquired by Coupa in 2020) fully performed its obligations under the 2018 General Release Agreement.

99.     Hicks breached the 2018 General Release Agreement, including at least by: retaining the company's confidential information and failing to return it; using the company's confidential information at Optilogic; and disclosing the company's confidential information to others.

100.    Hicks's violations of his contractual obligations have been continuous and ongoing since his founding of Optilogic.

101.    Plaintiffs did not become aware that Hicks had created a company offering a competing software platform based on Plaintiffs' intellectual property, or that he had hired a large team of former LLamasoft and Coupa employees, until around November 2022. Plaintiffs could not have learned of Hicks's actions before that time through the exercise of reasonable diligence.

102.    As a direct and proximate result of Hicks's breaches, Plaintiffs have suffered damages, and Hicks has been unjustly enriched, in an amount to be determined at trial.

## COUNT FOUR
### (Breach of 2018 Letter Agreement)
### (Against Hicks)

103.    Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 102 of this Complaint.

104.    On July 12, 2018, Hicks entered a Letter Agreement with LLamasoft, attached as **Exhibit F**.

105.    LLamasoft (acquired by Coupa in 2020) fully performed its obligations under the 2018 Letter Agreement.

106.    Hicks breached the 2018 Letter Agreement, including at least by: using the company's confidential information at Optilogic, and disclosing the company's confidential information to others.

107.    Hicks's violations of his contractual obligations have been continuous and ongoing since his founding of Optilogic.

108.    Plaintiffs did not become aware that Hicks had created a company offering a competing software platform based on Coupa's intellectual property, or that he had hired a large team of former LLamasoft and Coupa employees, until around November 2022. Plaintiffs could not have learned of Hicks's actions before that time through the exercise of reasonable diligence.

109.    As a direct and proximate result of Hicks's breaches, Plaintiffs have suffered damages, and Hicks has been unjustly enriched, in an amount to be determined at trial.

**<u>COUNT FIVE</u>**
**(Breach of Fiduciary Duty)**
**(Against Hicks)**

110.    Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 109 of this Complaint.

111.    In connection with becoming the Board Chair of LLamasoft, Hicks entered the 2018 letter agreement attached as **Exhibit F**.  In this agreement, and under Delaware law by virtue of his role as a board member, Hicks owed LLamasoft the fiduciary duty of loyalty.

112.    Hicks violated his fiduciary duties by forming Optilogic while he was still a LLamasoft board member and/or at a time when he still owed LLamasoft fiduciary duties.

113.    Plaintiffs did not learn that Hicks had created a company offering a competing software platform based on Coupa's intellectual property, or that he had hired a large team of former LLamasoft and Coupa employees to offer this competing software platform, until around November 2022.  Plaintiffs could not have learned of Hicks's actions before that time through the exercise of reasonable diligence.

114.    As a direct and proximate result of Hicks's breaches, Plaintiffs have suffered damages, and Hicks has been unjustly enriched, in an amount to be determined at trial.

<u>**COUNT SIX**</u>
**(Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*)**
**(Against Optilogic, Hicks, and DOES 1–10)**

115.    Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 114 of this Complaint.

116.    Coupa's trade secrets include but are not limited to information regarding the algorithms that power its supply chain design and planning program, including algorithms for network optimization, inventory optimization, transportation optimization, simulation, Greenfield analysis, and enterprise simulation.  These algorithms are found within the Supply Chain Modeler source code.

117.    Coupa's trade secrets have significant value, resulting from significant investment of time and resources.  To Coupa's knowledge, no other companies that offer supply chain management software (aside from Optilogic) use the same algorithms as Coupa, and no company offers the breadth of algorithms incorporated into the Coupa software.  Coupa's trade secrets derive independent economic value from being secret, including because they provide Coupa an advantage against its competitors.

118.    Coupa has made, and continues to make, efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets.  These efforts include, among other things, instructing all persons who are given access to trade secrets to protect and maintain the confidentiality of the information.  Coupa requires its employees to sign confidentiality agreements.  It also requires that passwords and other authentication measures be used to prevent unauthorized access, use, or disclosure of trade secret information.

119.    Coupa has at all times maintained security measures that are reasonable under the circumstances to preserve the secrecy of its trade secrets.  Its trade secrets are not generally known or readily ascertainable through legitimate means.

120.    Coupa's trade secrets were trade secrets at the time that they were disclosed to Hicks and to the former LLamasoft and Coupa employees identified in this Complaint subject to confidentiality agreements.

121.    Defendants improperly used Coupa's trade secrets without Coupa's consent and at the time of such use, Defendants knew, or had reason to know that their knowledge of Coupa's trade secrets was acquired subject to confidentiality obligations, which created legal obligations to keep the trade secret information secret.

122.    As a natural and proximate result of Defendants' misappropriation, Plaintiffs have suffered injury and harm.  For example, as a direct consequence of Defendants' actions, Optilogic now offers supply chain design and planning products using Coupa's technology in direct competition with Coupa, whereas before, Coupa was the only company in the world offering its technology.  In addition, Coupa's reputation and business have been harmed by Defendants' misappropriation and subsequent use of Coupa's information, including the actual and potential loss of customers due to their actions.  Defendants also harmed Coupa's reputation as an innovative company offering the leading solution for supply chain design and planning.

123.    Defendants have been unjustly enriched, in amounts according to proof. Defendants benefited from the information misappropriated from Coupa.  Defendants used the information and confidence in Coupa's technology it had gained from their employment with LLamasoft and Coupa to inspire, direct, and develop the designs for Optilogic's supply chain products.  Defendants copied Coupa's technology and presented it as Optilogic's technology,

resulting in the enhancement of Optilogic's reputation as an innovator in supply chain design and planning.

124.    Defendants' benefit came at Plaintiffs' expense.  Because Defendants failed to attribute this technology as Coupa's and instead claimed it as Optilogic's, Coupa's reputation as an innovator in supply chain design and planning was not enhanced whereas Optilogic's was. Optilogic's use of Coupa's technology without acknowledging Coupa's rights over it has also caused consumers of supply chain design and planning products to terminate their relationships with Coupa and to use Optilogic instead.  Additionally, it would have taken Optilogic much longer and cost it much more money to develop its technology had it not misused Coupa's technology for its own benefit.

125.    Defendants' trade secret misappropriation has caused and continues to cause Coupa irreparable harm that cannot be fully redressed through damages alone.  An injunction is necessary to provide Coupa with complete relief.

126.    In misappropriating Coupa's trade secrets, Defendants acted willfully and maliciously.  Plaintiffs are thus entitled to punitive and exemplary damages against Defendants.

127.    Coupa's confidential, proprietary, and trade secret information relates to products and services used, sold, and/or ordered in, or intended to be used, sold, and/or ordered in, interstate or foreign commerce.  Coupa's trade secrets were integral to Coupa's supply chain design and modeling solution intended for and used in interstate and foreign commerce.  Defendants have been and are continuing to use the confidential trade secrets Defendants stole from Coupa to generate business from customers located all over the United States and the world.

**COUNT SEVEN**
**(Intentional Interference with Contractual Relations)**
**(Against Optilogic, Hicks, and DOES 1–10)**

128.    Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 127 of this Complaint.

129.    Hicks and Optilogic, knowing that the prior employment contracts contained valid confidentiality agreements between Janowiak, Wilson, Ames, Sommer, Taghavi, Castaing, Surel, and Yovan, on the one hand, and either LLamasoft, Coupa, or both, on the other, recruited them and convinced them to breach their obligations under their employment contracts by assisting Optilogic in the unauthorized use of Coupa's technology in order to compete against Coupa.

130.    Hicks and Optilogic took this action with the intent to disrupt these former Coupa and LLamasoft employees in the performance of their contracts or knowing that the disruption of performances was certain or substantially certain to occur.

131.    Coupa and LLamasoft lost the benefit of the employees' performance, and Hicks's and Opitlogic's wrongful conduct was a substantial factor in causing Plaintiffs' harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court award judgment in Plaintiffs' favor and against Defendants for:

1.    Damages from Defendants according to proof;

2.    Damages from Defendants in an amount not less than the combination of (i) the revenues derived from Optilogic's sale or licensing the use of infringing products to customers from and after the date that Optilogic was incorporated, plus (ii) revenues lost by Plaintiffs from customers who were induced by Optilogic to terminate their use of Coupa's SCDP software in favor of Optilogic's infringing products;

3.      Disgorgement from Defendants of unjust enrichment according to proof;

4.      Injunctive relief under 17 U.S.C. § 502 enjoining Defendants, their officers, agents, servants, employees, successors, assigns and all persons acting in concert with any of them, from directly or indirectly engaging in acts that infringe Coupa's copyrights;

5.      Injunctive relief enjoining Defendants, their officers, agents, servants, employees, successors, assigns and all persons acting in concert with any of them, from directly or indirectly using or disclosing any of Coupa's trade secrets, confidential know-how, and proprietary information regarding Coupa's supply chain design and planning products;

6.      Injunctive relief enjoining Defendants, their officers, agents, servants, employees, successors, assigns and all persons acting in concert with any of them, from directly or indirectly engaging in acts that intentionally interfere with Plaintiffs' agreements with former employees;

7.      Punitive and exemplary damages as may be provided by law;

8.      An award of actual damages and any additional infringer's profits under 17 U.S.C. § 504 together with pre-judgment and post-judgment interest on the damages awarded;

9.      Plaintiffs' attorneys' fees and costs as may be provided by law and by contract;

10.      Prejudgment and post-judgment interest; and

Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues raised by the Complaint.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)
Anthony Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
began@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Coupa Software Inc.*

OF COUNSEL:

Alex Reese
Winston Liaw
Cameron Gibbs
MaryJo Lopez-Oneal
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA  94104
(415) 954-4400

November 20, 2024