# EXHIBIT A

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

**TX 9-354-381**

**Effective Date of Registration:**
January 26, 2024
**Registration Decision Date:**
January 30, 2024

---

## Title

| | |
|---|---|
| **Title of Work:** | SCG Suite |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2018 |
| **Date of 1st Publication:** | February 28, 2018 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | Coupa Software Incorporated |
| **Author Created:** | computer program |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Coupa Software Incorporated |
| | 1855 S. Grant Street, San Mateo, CA, 94402, United States |

## Certification

| | |
|---|---|
| **Name:** | Nate A. Garhart |
| **Date:** | January 26, 2024 |
| **Applicant's Tracking Number:** | 44319 |

---

| | |
|---|---|
| **Correspondence:** | Yes |

Page 1 of 1

# EXHIBIT B

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## TX 9-354-387

**Effective Date of Registration:**
January 26, 2024
**Registration Decision Date:**
January 30, 2024

## Title

**Title of Work:**  SCGX 31.0.0

## Completion/Publication

**Year of Completion:**  2021
**Date of 1st Publication:**  August 31, 2021
**Nation of 1st Publication:**  United States

## Author

- **Author:**  Coupa Software Incorporated
  **Author Created:**  revised computer program
  **Work made for hire:**  Yes
  **Citizen of:**  United States

## Copyright Claimant

**Copyright Claimant:**  Coupa Software Incorporated
1855 S. Grant Street, San Mateo, CA, 94402, United States

## Limitation of copyright claim

**Material excluded from this claim:**  previous version
**Previous registration and year:**  TX0009354381, 2024

**New material included in claim:**  revised computer program

## Certification

**Name:**  Nate A. Garhart
**Date:**  January 26, 2024
**Applicant's Tracking Number:**  44319

Page 1 of 2

**Correspondence:** Yes

# EXHIBIT C

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director



**Registration Number**

## TX 9-354-392

**Effective Date of Registration:**
January 26, 2024
**Registration Decision Date:**
January 30, 2024

---

## Title

        **Title of Work:**  SCGX 32.0.0

## Completion/Publication

        **Year of Completion:**  2021
     **Date of 1st Publication:**  December 10, 2021
    **Nation of 1st Publication:**  United States

## Author

     &bull;     **Author:**  Coupa Software Incorporated
     **Author Created:**  revised computer program
  **Work made for hire:**  Yes
        **Citizen of:**  United States

## Copyright Claimant

    **Copyright Claimant:**  Coupa Software Incorporated
                     1855 S. Grant Street, San Mateo, CA, 94402, United States

## Limitation of copyright claim

  **Material excluded from this claim:**  previous version
   **Previous registration and year:**  TX0009354381, 2024
                               TX0009354387, 2024

   **New material included in claim:**  revised computer program

## Certification

             **Name:**  Nate A. Garhart
              **Date:**  January 26, 2024
  **Applicant's Tracking Number:**  44319

**Correspondence:**   Yes

# EXHIBIT D

Execution version

**RESTRICTIVE COVENANT AGREEMENT**

THIS AGREEMENT (this "Agreement") is made and entered into as of June 1, 2017 ("Closing Date"), by and among Donald A. Hicks, an individual residing in Ann Arbor, Michigan (the "Stockholder"), LLamasoft, Inc., a Delaware corporation (the "Company"), and Laurel Parent Holdings, Inc., a Delaware corporation ("Holdings") (the Stockholder, the Company and Holdings, collectively, "Parties," and, each of them, individually, "Party"). All references in this Agreement to "Company" refer to and include each of Holdings, the Company, Parent, Merger Sub and each of the Company's Subsidiaries, unless the context expressly requires otherwise. Capitalized terms used but not defined otherwise in this Agreement have the respective meanings set forth in the Merger Agreement.

**RECITALS**

WHEREAS, simultaneously with the execution of this Agreement, the Stockholder, in his capacity as an owner of shares of the Company, and certain other Stockholders (as defined in the Merger Agreement), are approving the merger of Merger Sub with and into the Company, with the Company continuing as the surviving company (the "Merger"), pursuant to that certain Agreement and Plan of Merger dated as of April 26, 2017 (as may be amended from time to time, the "Merger Agreement"), by and among Parent, Merger Sub, the Company, and the Representative; and

WHEREAS, the Stockholder is entering into this Agreement in consideration for the benefits it will receive from the execution of the Merger Agreement and the consummation of the transactions contemplated thereby as a result of its equity ownership in the Company.

NOW, THEREFORE, in consideration of the foregoing recitals and the representations, warranties and agreements contained in the Merger Agreement and this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties, intending to be bound legally, hereby agree as follows:

**1.1    Confidentiality**.

(a)    The Stockholder agrees that Confidential Information (as defined below) furnished and to be furnished to him was and shall be made available in connection with such Stockholder's investment in the Company. Such Stockholder acknowledges that the Confidential Information which such Stockholder has obtained or will obtain is the property of the Company. The Stockholder agrees that he or she will not disclose any Confidential Information to any other Person, except that Confidential Information may be disclosed: (i) to the extent required by applicable law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which an other Stockholder (as defined in the Merger Agreement) is subject); provided that, subject to subclause (a)(ii) below), such Stockholder gives the Company prompt notice of such requests, to the extent practicable, so that the Company may seek an appropriate protective order or similar relief (and the Stockholder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation); (ii) to report possible violations of federal securities laws to the appropriate government enforcing agency, to respond to inquiries from such agencies and to make such other disclosures that are expressly protected under such laws, none to which activities requires the Stockholder to provide prior notice to or seek prior authorization from the Company; and (iii) if the prior written consent of the Company shall have been obtained. The provisions of this Section 1.1 are in addition to, and separate from, any similar covenants and restrictions in respect of Confidential Information to which the Stockholder may be subject by reason of any employment or consulting relationship wht the Company or its Affiliates or transactions involving the Company.

KE .

(b)     The Stockholder and its Affiliates may disclose Confidential Information to (i) its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or related to their reporting obligations to partners; and (ii) any Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Stockholder in the ordinary course of business, provided that such Stockholder informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information.

(c)     For purposes of this Agreement, "Confidential Information" shall mean any confidential or proprietary information relating to the business or affairs of the Stockholders, the Company or any of their respective Affiliates, including, but not limited to, any information provided or given access to pursuant to this Agreement or the Merger Agreement, information relating to financial statements, customer identities, potential customers, employees, sales representatives, suppliers, servicing methods, equipment programs, pricing, acquisition targets, strategies and information, analyses, profit margins or other proprietary information used by such Stockholder, the Company or any of their respective Affiliates; provided that Confidential Information shall not include information that (i) is or becomes generally known to the public other than as a result of a disclosure by such Stockholder in violation of this Agreement, (ii) is or was available to such Stockholder on a non-confidential basis prior to its disclosure to such Stockholder, or (iii) was or becomes available to such Stockholder on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not bound by a confidentiality agreement with the Company or another person.

1.2     **Non-Competition**.  The Stockholder agrees that for a five (5) year period after the date hereof (the "Restricted Period"), such Stockholder shall not, directly or indirectly, whether as a stockholder, owner, member, partner, director, officer, employee, agent, consultant or contractor, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged (i) in competition with the Company during such Stockholder's Restricted Period, or (ii) in the business of the design, development, marketing, sale and/or provision of commercial supply chain design, supply chain planning, or supply chain execution software and services, in any geographical or market area where Company has conducted business or provides products or services during such Stockholder's employment or engagement as a consultant with the Company (the "Restricted Territory").  Notwithstanding the foregoing, nothing herein shall prohibit (i) any Stockholder from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation that would be covered by clause (i) or (ii) above, so long as such Stockholder has no active participation in the business of such corporation during such Stockholder's Resricted Period, or (ii) any Stockholder from investing in securities of a private company that would be covered by clause (i) or (ii) above during such Stockholder's Restricted Period.

1.3     **Non-Solicitation**.

(a)     During the Restricted Period, the Stockholder agrees not to, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any individual or entity that is, or was during the twelve (12) month period immediately prior to the end of the Restricted Period, a customer of the Company or any of its Affiliates to purchase goods or services then sold by the Company or any of its Affiliates from another Person or assist or aid any other Person in identifying or soliciting any such customer.

(b)     During the Restricted Period, the Stockholder agrees not to, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce

2

any advisor, consultant, employee, contract worker, representative or agent of the Company or any of its Affiliates to leave such employment or other position or solicit, aid or induce any employee of the Company or any of its Affiliates to accept employment with or render services to or with any other Person unaffiliated with the Company or hire or retain any such employee Person, or take any action to materially assist or aid any other Person in identifying, hiring or soliciting any such employee, representative or agent, provided, however, that the foregoing shall not prohibit the solicitation of any person by general advertisements not specifically directed towards the Company's advisors, consultants, employees, contract workers, representatives or agents, or (B) interfere, or aid or induce any Competitor in interfering, with the relationship between the Company or any of its Affiliates and any of their respective vendors, joint venturers or licensors in a manner to diminish or curtail their business dealings. Any Person described in this <u>Section 1.3</u> shall be deemed covered by this Section while so employed or retained and for a period of eighteen (18) months thereafter.

1.4     **Non-Disparagement**.  The Stockholder agrees not to intentionally disparage any party to the Merger Agreement, the Company or any of their respective Affiliates, or any of their respective partners, members, officers, directors, employees, shareholders, agents or products.  The foregoing shall not be violated by truthful statements in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, depositions in connection with such proceedings).

1.5     **Reasonableness of Restrictions**.  In signing this Agreement, the Stockholder has carefully read and considered all of the terms and conditions of this Agreement.  The Stockholder agrees that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and their trade secrets and Confidential Information, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, are reasonable.  The Stockholder acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and its Affiliates and that such Stockholder has sufficient assets and skills to provide a livelihood while such covenants remain in force.  The Stockholder further covenants that such Stockholder will not challenge the reasonableness or enforceability of any of the covenants set forth herein.  The Company and the Stockholder agree that, in any action to enforce any of the provisions of this Agreement, the non-prevailing party in such dispute will reimburse the prevailing party for all costs (including reasonable attorneys' fees) incurred in connection with any such action.  It is also agreed that each of the Company's Affiliates will have the right to enforce all of such Stockholder's obligations to that Affiliate under this Agreement and shall be third party beneficiaries hereunder.  The Stockholder acknowledges and agrees that the restrictive covenants set forth in this Agreement are independent covenants and shall be in addition to, and shall not supersede or be deemed to be in lieu of, any restrictive covenants set forth in any other agreement between such Stockholder and the Company or its Affiliates, including, without limitation, any restrictive covenants set forth in any employment agreement, equity-based incentive plan or grant agreement.

1.6     **Assignment**. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective heirs, successors, legal representatives and permitted assigns. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any Party.

1.7        **Miscellaneous**.

(a)     **Notices**.  All notices, requests and other communications to any party shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by electronic mail:

<table>
<tr><td>If to Stockholder:</td><td>Donald A. Hicks<br>233 Hunters Trl<br>Ann Arbor, MI  48103</td></tr>
</table>

If to Holdings or the Company:

        c/o TPG Capital LP
        345 California Street, Suite 3300
        San Francisco, California  94101
        Attention:      Adam Fliss, Deputy General Counsel
        Facsimile:      (415) 438-1349
        Email:        afliss@tpg.com

with copies to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York  10022
        Attention:      Michael Weisser; Adele Maloney
                          Thomas
        Email:        michael.weisser@kirkland.com;
                          adele.maloneythomas@kirkland.com

or, in each case, at such other mailing address or e-mail address as such party may hereafter specify for the purpose of notices hereunder by written notice to the other parties hereto. All notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt. Any notice, request or other written communication sent by e-mail transmission shall be deemed made on the date that such e-mail is sent with proof of delivery.

       (b)      **Waiver; Amendment**.  No provision of this Agreement may be waived except by an instrument in writing executed by the Party against whom the waiver is to be effective. No provision of this Agreement may be amended or otherwise modified except by an instrument in writing executed by the Parties.  No waiver by any Party with respect to any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent occurrence.

       (c)      **Fees and Expenses**.  Each Party shall pay its own costs and expenses incurred in connection with the preparation and execution of this Agreement.

       (d)      **Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of laws rules of such state.

       (e)      **Jurisdiction**.  The Parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the federal or state courts sitting in the State of Delaware, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a

transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form; provided that any action to enforce a judicial award of a state or federal court in the State of Delaware pursuant to this Section 1.7(e) may be brought in any court of competent jurisdiction in any state or jurisdiction where the party against which enforcement is sought has operations or owns assets. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 1.7(e) shall be deemed effective service of process on such Party.

(f)    **Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(g)    **Specific Enforcement; Cumulative Remedies**.  The Parties hereto acknowledge that money damages may not be an adequate remedy for violations of this Agreement and that any Party, in addition to any other rights and remedies which the parties may have hereunder or at law or in equity, may, in his, her or its sole discretion, apply to a court of competent jurisdiction for specific performance or injunction or such other relief as such court may deem just and proper in order to enforce this Agreement or prevent any violation hereof and, to the extent permitted by applicable law, each Party waives any objection to the imposition of such relief. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by any Party shall not preclude the simultaneous or later exercise of any other such rights, powers or remedies by such Party.

(h)    **Entire Agreement**.  This Agreement and other documents referred to herein constitute the entire agreement and understanding among the Parties hereto in respect of the subject matter hereof and thereof and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties hereto, or between any of them, with respect to the subject matter hereof and thereof.

(i)    **Severability**.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(j)    **Counterparts; Effectiveness**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*[Signature page follows]*

5

**IN WITNESS WHEREOF**, the Parties have executed this Restrictive Covenant Agreement as of the Closing Date.

STOCKHOLDER:                          DONALD A. HICKS

By:
Name:_____
Title:_____

**LLAMASOFT, INC.**

By:_____

Name:

Title:

**LAUREL PARENT HOLDINGS, INC.**

By: _____
Name:  Michael  LaGatta
Title:    Vice President

# EXHIBIT E

# **GENERAL RELEASE**

I, <u>Donald A. Hicks</u>, in consideration of and subject to the performance by LLamasoft, Inc. (together with its direct and indirect parents and subsidiaries, the "<u>Company</u>") of its obligations under Schedule A attached hereto (the "<u>Schedule</u>"), do hereby release and forever discharge, as of the date hereof (the "<u>Execution Date</u>"), the Company and its affiliates and all present, former and future managers, directors, officers, employees, successors and assigns of the Company and its affiliates and direct or indirect owners (collectively, the "<u>Released Parties</u>") to the extent provided below (this "<u>General Release</u>"). The Released Parties are intended to be third-party beneficiaries of this General Release, and this General Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Released Parties hereunder.

1.      I acknowledge and agree that my employment with the Company terminated on April 16, 2018 (the "<u>Separation Date</u>").

2.      Contingent on my execution and non-revocation of this General Release by no later than May 23, 2018, I will receive the consideration set forth on the Schedule, and I understand that any payments or benefits paid or granted to me under the Schedule represent, in part, consideration for execution and non-revocation of this General Release and are not salary, wages or benefits to which I was already entitled.  I understand and agree that I will not receive certain of the payments and benefits specified in the Schedule, unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or its affiliates. I expressly acknowledge the adequacy and sufficiency of the consideration flowing to me for the execution and non-revocation of this General Release.

3.      Except as provided in paragraphs 5 and 5 below and except for the provisions of the Schedule which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself and my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the Execution Date) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties, which I, my spouse, or any of my heirs, executors, administrators or assigns may have, and which arise out of or are connected with my employment with, or my separation or termination from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or

procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to herein as the "Claims").

4.      I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 3 above.

5.      I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 ("ADEA") which arise after the Execution Date. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of this General Release shall not serve as the basis for any claim or action (including, without limitation, any claim under the ADEA). I acknowledge that I have entered into this General Release freely and without coercion, that I have been advised by the Company to consult with counsel of my choice and that I have been given more than twenty- one (21) days to do so. I acknowledge that I am releasing all claims under the ADEA. I further acknowledge that I will have the unilateral right to revoke this General Release within the seven (7)-day period following my execution of this General Release (the "Revocation Period"), and that the Company's continuing obligations under the General Release will become effective only upon the expiration of the Revocation Period without my revocation hereof. In order to be effective, written notice of my revocation of this General Release must be sent to the Company, ATTN: General Counsel, at the Company's headquarters, and received by the Company on or before the last day of the Revocation Period.

6.      I acknowledge that I have been reimbursed by the Company for all business expenses incurred in conjunction with the performance of my employment and that no other reimbursements are owed to me. I further acknowledge that I have received payment in full for all services rendered in conjunction with my employment by the Company, and that no other compensation or benefits are owed to me except as explicitly provided in this General Release.

7.      I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, I am not waiving (i) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under the Company's organizational documents or otherwise, (ii) my rights as an equity or security holder in the Company or its affiliates, or (iii) my rights to any Residual Post-Closing Payments (as such term is defined in that certain Agreement and Plan of Merger, dated April 26, 2017, by and among Laurel Parent, Inc., Laurel Parent Sub, Inc., LLamasoft, Inc., and Fortis Advisors LLC, as the representative).

8.      In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express

terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Schedule. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law. I further agree that I am not aware of any pending claim of the type described in paragraph 3 above as of the execution of this General Release.

9.    I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

10.    I agree that if I violate this General Release by suing the Company or the other Released Parties, I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees.

11.    I agree that this General Release and the Schedule are confidential and agree not to disclose any information regarding the terms of this General Release or the Schedule, except to my immediate family and any tax, legal or other counsel I have consulted regarding the meaning or effect hereof or as required by law, and I will instruct each of the foregoing not to disclose the same to anyone.

12.    Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other self-regulatory organization or any governmental entity.

13.    I hereby acknowledge that the terms and conditions set forth in the Schedule shall survive my execution of this General Release.

14.    I represent and warrant that, following the Separation Date, I may retain confidential information of the Company currently in my possession or control, for the sole purpose of using same in my capacity as an investor in, and member of the Board of Directors of, the Company. If, at some point following the Separation Date, I cease to be an investor in the Company, I shall promptly return to the Company all confidential information then in my possession or control, including (without limitation) all documents of any kind and in whatever medium evidenced; provided that, notwithstanding anything to the contrary in the foregoing, I may retain any confidential information which it would be an administrative burden to return, so long as I do not use or disclose such confidential information to any third party, except as specifically authorized by law.

15.    I represent that I am not aware of any claim by me other than the claims that are released by this General Release. I acknowledge that I may hereafter discover claims or facts in

3

addition to or different than those which I now know or believe to exist with respect to the subject matter of the release set forth in paragraph 3 above and which, if known or suspected at the time of entering into this General Release, may have materially affected this General Release and my decision to enter into it.

16.     Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the Schedule after the date hereof.

17.     Whenever possible, each provision of this General Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

1.  I HAVE READ IT CAREFULLY;

2.  I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING, BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963, THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

3.  I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

4.  I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

5.  I HAVE HAD AT LEAST TWENTY-ONE (21) DAYS FROM THE DATE OF MY RECEIPT OF THIS GENERAL RELEASE TO CONSIDER IT, AND THE CHANGES MADE SINCE MY RECEIPT OF THIS GENERAL RELEASE ARE NOT MATERIAL OR WERE MADE AT MY REQUEST AND WILL NOT RESTART THE REQUIRED TWENTY-ONE (21)-DAY PERIOD;

6.  I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS GENERAL RELEASE TO REVOKE IT AND THAT THIS GENERAL RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

KE 52236455.6

7.  I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

8.  I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED: Donald Hicks (Jul 12, 2018)                    DATED: Jul 12, 2018

## <u>SCHEDULE A</u>

ǐ  You will retain your email address as long as you are a LLamasoft shareholder, and not involved in any competitive business in any capacity. If the Board determines that it is in the best interest of LLamasoft for you not to have an email the Board can cancel the email address again at any time.

ǐ  If you would like to hire an individual who in the past has been a LLamasoft employee into a company you are associated with that would otherwise fall under the non-hire clause you had previously agreed to, the Board is willing to consider any requests on a case by case basis at the time. You agree not to solicit or encourage any current LLamasoft employees to leave their jobs with LLamasoft.

ǐ  We agree to make a day 1 exception to the non-hire provision to allow you to hire Julie Whalls to your investment company and Simon McCluskey to Saganworks should both of them leave LLamasoft by their own accord (we expect you to not encourage them to leave LLamasoft to join you elsewhere). If Julie Whalls or Simon McCluskey are hired by an entity in which you are affiliated with and then subsequently Julie or Simon take actions that you yourself would be prohibited from taking under your restrictive covenant agreement (e.g., soliciting others), then you will liable for such actions of Julie or Simon as if you took such actions directly.

ǐ  If you would like to hire an individual who in the past has been a LLamasoft employee into a company you are associated with that would otherwise fall under the non-hire clause you had previously agreed to, the Board is willing to consider any requests on a case by case basis at the time. You agree not to solicit or encourage any current LLamasoft employees to leave their jobs with LLamasoft. The board will not unreasonably withhold permission to hire former LLamasoft employees who have left LLamasoft of their own volition, and were not solicited by you.

ǐ  Share buy-back: The Company and/or TPG/GS/MK may make an offer to you for up to 50% of your shares before the year end 2018. The price will be determined by the investors at the time and you can choose whether to accept the offer or not.

   o  If you accept the offer you sell us the shares.

   o  If you choose not to accept our offer in a scenario where the offer is at the Series C price or above you will not have the right to otherwise offer your shares to a 3rd party.

   o  If you choose not to accept our offer in a scenario where the offer is below the Series C price you have 6 months after the offer has been made to approach potential 3rd party investors to buy up to 50% of your shares. You can sell your shares to such 3rd party investor as long as the price at which you are selling those shares to such 3rd party investor is above the price offered by the Company and/or TPG/GS/MK, provided, that, if you receive such a qualifying offer from a 3rd party, TPG shall be provided a period of ten business days to match such offer, and, if TPG does agree to match such offer within such period, you will be required to sell such shares to TPG upon such terms.

   o  If the Company/TPG/GS/MK do not make you any offer for 50% of your shares by 31st December 2018 you are free to sell up to 50% of your shares to a 3rd party at any price in the following 6 month period; provided, that, if you receive an offer for your shares from a 3rd party, TPG shall be provided a period of ten business days to match such offer, and, if TPG does agree to match such offer within such period, you will be required to sell such shares to TPG upon such terms.

   o  If you do sell up to 50% of your shares to a 3rd party such 3rd party needs to sign an accession to the stockholder agreement. Such 3rd party can only be a financial not a strategic investor and if it is a financial investor cannot hold an investment greater than 5% in a competing business to LLamasoft. Such 3rd party will not receive any board seat or any other "special" rights.

# General Release - Donald Hicks_7-11-18

Adobe Sign Document History                           07/12/2018

| | |
|---|---|
| Created: | 07/11/2018 |
| By: | Craig Wigley (craig.wigley@llamasoft.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA2JEoUDuzTX5iGEwg31jYDZjQCrVR6Vu9 |

## "General Release - Donald Hicks_7-11-18" History

Document uploaded by Craig Wigley (craig.wigley@llamasoft.com) from Acrobat
07/11/2018 - 3:10:07 PM PDT- IP address: 50.224.85.2

Document emailed to Donald Hicks (don.hicks@llamasoft.com) for signature
07/11/2018 - 3:10:45 PM PDT

Document viewed by Donald Hicks (don.hicks@llamasoft.com)
07/11/2018 - 10:41:13 PM PDT- IP address: 82.123.15.85

Document e-signed by Donald Hicks (don.hicks@llamasoft.com)
Signature Date: 07/12/2018 - 1:38:52 AM PDT - Time Source: server- IP address: 107.77.233.50

Adobe Sign

# EXHIBIT F



201 S. Division Street, Suite 200
Ann Arbor, Michigan 48104, USA
Toll Free: +1 866.598.9831
Phone: +1 734.418.3119
www.LLamasoft.com

July 11, 2018

Mr. Donald Hicks
233 Hunters Trail
Ann Arbor, MI  48103

Dear Don,

We would like to set forth the terms of your compensation as a Chairman of the Board of Directors (the "Board") of LLamasoft, Inc. (the "Company").

### I.    Board Service

You will serve as Chairman of the Board of Directors until either side informs the other side that in their view Chairman role should be assumed by another Board member (i.e. in case either side believes that "this is not working out").

### II.    Annual Fee.

You will receive a salary of ▮▮▮▮▮▮ per year, payable monthly in arrears, beginning April 16, 2018 and for so long as you remain Chairman of the Board of Directors.

### III.    Attendance at Board Meetings

We anticipate that there will be four (4) Board meetings per year.  We also anticipate that you will be asked to serve on one or more Board committees.  You will be expected to use your reasonable best efforts to attend all Board and committee meetings.  Otherwise, you may attend such meetings by telephonic or other electronic means.  Reasonable expenses actually incurred by you in traveling to the Board and committee meetings shall be reimbursed by the Company upon presentation of such documentation as the Company may reasonably request.

### IV.    Fiduciary Duties

Your service as a member of the Board will be subject to fiduciary duties as provided for under applicable law, such as the duties of care and loyalty (including an obligation to maintain the confidentiality of the Company's proprietary and confidential information that will be provided to you in the course of your serving as a member of the Board, and by signing below, you acknowledge and agree to comply with such duties and obligations).

### V.    Directors' Liability Insurance and Indemnification

The Company will provide you with customary directors' liability insurance.  In addition, the Company's corporate documents include customary director's indemnification provisions.



## VI.    Reelection to the Board

Your continued service on the board will be subject in all respects to the provisions of the Bylaws and other governing documents of the Company. You have been elected to hold the Company common stock Director's seat as a result of your voting stock. Your ongoing status as a Director representing the former common shareholders will be subject to periodic re-election by the voting shareholders as per the Bylaws.

If you have any questions, please let me know. The Board and the Company are looking forward to your support and guidance.

Very Best Regards,

Razat Gaurav
Chief Executive Officer
LLamasoft, Inc.


Accepted:

Signature: Donald Hicks (Jul 12, 2018)        Date: Jul 12, 2018